**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        )
NJ BUILDING LABORERS                    )        Civil Action No.: 10-4212 (FLW)
STATEWIDE BENEFIT FUNDS AND             )
TRUSTEES THEREOF,                       )
                                        )
              Petitioners,              )            **OPINION**
v.                                      )
                                        )
CHANREE CONSTRUCTION                    )
CO., INC.,                              )
                                        )
              Respondent.               )
_____

**WOLFSON, United States District Judge:**

      Petitioners New Jersey Building Laborers' Statewide Benefits Funds (the "Funds") and Trustees Thereof (the "Trustees") (collectively, "Petitioners) initiated this action against general contractor Chanree Construction Company ("Chanree") to enforce a labor arbitration award obtained against Chanree under the terms of a collective bargaining agreement ("CBA") that required Chanree to assume liability for delinquent contributions owed to the Funds by a subcontractor employed by Chanree.  Presently before the Court is Petitioners' petition to confirm the arbitration award, as well as Chanree's cross-motion to vacate the arbitration award. For the reasons set forth that below, the Court confirms the arbitration award in the amount of $220,887.58.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties and Relevant Agreements

Petitioners are named beneficiaries in a CBA (the "Laborers' CBA") to which the New Jersey Building Laborers' District Council (the "Union"), Chanree and Palmer Construction ("Palmer") were signatories to at all times relevant to the instant action.[1]  In its capacity as a general contractor, Chanree occasionally subcontracts work to Palmer.  (*See* Monica Cert., Ex. D (hereinafter "Arbitration Award") at 6).  As signatories to the Laborers' CBA, Chanree and Palmer agree to remit certain benefit contributions to the Funds on behalf of its employees.  (*See* Monica Cert., Ex. A. (hereinafter "CBA") at Art. 14); *see also* Arbitration Award at 7).  Furthermore, Chanree also agreed to assume liability for delinquent benefit contributions owed by its subcontractors:

> If the Employer subcontracts any work covered by this Agreement to any subcontractor or other person, the Employer shall be liable for all contributions owing to the funds established or to be established hereunder in the event the subcontractor or person fails to pay contributions to the said funds for employees covered by this Agreement employed by the said subcontractor or person.

(*See* CBA at Art. 16.10).  The Laborers' CBA also requires Chanree, upon notice that a subcontractor it employs has failed to pay delinquent monies to the Funds, to withhold the delinquent amount and make such payments to the Funds:

> In the event that an employer or subcontractor signatory to this Agreement is delinquent in the payment of employee fringe benefit contributions or deductions from wages, a general contractor[,] . . . upon written notification from the benefit funds[,] . . .  shall, upon receipt of such notification, withhold the full amount of said delinquency from any further payment due the employer or subcontractor

---

[1] At all relevant times to this action, the Funds were trust funds under § 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), and employee benefit funds under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(e)-(f). Furthermore, at all relevant times the Trustees were and are fiduciaries within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

> from the general contractor[,] . . .  and make payment thereof in such amount as claimed to the funds. The employer or subcontractor, by execution of this Agreement, consents to and directs such withholding and payment to the [F]unds[.]"

(*See id*. at Art. 16.20).

In order to compel disbursement of delinquent fringe benefit contributions from contractors and subcontractors, the Laborers' CBA specifically affords the Trustees with "such rights and duties as set forth in the Declaration of Trust of the Funds [the "Trust Agreement"] and any supplements or amendments thereto."   (*See* CBA at Art. 15.50(a)).   The Trust Agreement states that Petitioners are empowered to:

> take any action necessary or appropriate to enforce payment of the contributions, interest, damages, and expenses provided for herein, including, but not limited to, proceedings at law or in equity. The [Funds] and Trustees shall not be required to exhaust any grievance or arbitration procedure provided by a [CBA] or otherwise with respect to the enforcement of such Employer obligations, but rather shall have immediate access to the courts, as provided under applicable law, or to designate a permanent arbitrator to hear and determine collection disputes.

(*See* Monica Cert., Ex. C at Art. 4, Sec. 5).

The Union and Chanree are also signatories to a Project Labor Agreement (the "PLA") for work performed on the New Jersey Chesterfield Elementary School project ("Chesterfield Project"). (*See* Arbitration Award at 1; *see also* Hocking Cert, Ex. B. (hereinafter "PLA") at Art 1.1).   In its capacity as a general contractor, Chanree subcontracted work on the Chesterfield Project to Palmer.  (*See* Arbitration Award. at 7).  The PLA attached and incorporated the terms of the Laborers' CBA, and includes a provision that holds that, "[w]here a subject covered by the provisions, explicit or implicit, of [this PLA] is also covered by [the Laborers' CBA], the provisions of this [PLA] shall prevail."  (*See* PLA at Art 2.4).  The PLA includes a three-step arbitration procedure before the American Arbitration Association to settle non-strike disputes between signatory unions, employers, and employees.  (*See id*. at Art. 9).

3

**2. The Dispute and Arbitration**

In May 2010, the Funds, having learned that Palmer had repeatedly violated the Laborers' CBA by failing to remit benefit fund contributions on behalf of its employees, provided Chanree with a Jobsite Delinquency Report.  (*See* Arbitration Award at 7).  According to Petitioners, the Jobsite Delinquency Report stated that, from July 7, 2009 to May 11, 2010, Palmer's delinquencies to the Funds for the Chesterfield Project, as well as other projects on which Chanree was the general contractor, totaled $316,039.51.[2]  (*See id.*; *see also* Hocking Cert., Ex. E)  Thereafter, the Trustees pursued collections of such an amount in owed contributions, and later sent notice of a forthcoming arbitration hearing to Chanree and Palmer. (*See id.*)

On May 25, 2010, the Funds, as well as Chanree and Palmer, both of which were represented by counsel, appeared for a hearing before arbitrator J.J. Pierson, Esq. ("Pierson" or the "Arbitrator").[3]  (*See id.* at 8).  Before the Arbitrator, the Funds alleged that Palmer violated the Laborers' CBA by failing to remit required contributions to the Funds on behalf of its employees for work performed in and after July 2009 in the amount of $316,039.51, and that Chanree, upon notice of Palmer's delinquency, had failed to remit the amounts due from Palmer. (*See* Arbitration Award at 7).  In response, Chanree contested the arbitrability of the dispute, and

---

[2] While this is not clear from the Jobsite Delinquency Report, the Arbitration Award notes that the $316,039.51 amount reflects Palmer's total delinquent fund contributions for several projects, including but not limited to the Chesterfield Project.  (*See* Arbitration Award at 1).  Chanree does not dispute this finding of the Arbitrator, nor does the record reflect that Chanree has ever submitted an estimate of how much of Palmer's debt originates from work performed on the Chesterfield Project.  However, because the Court affirms the arbitration award, these facts are relevant to the Court's analysis.

[3] The Arbitration Award twice lists the date of the arbitration as May 24, 2010.  (*See* Arbitration Award at 8, n.1).

described arbitration before Pierson as "a strained and self-serving interpretation of the PLA." (*See id*. at 2).  Chanree argued that the Chesterfield Project is governed by the PLA, which contains a three-step arbitration process that supersedes the portions of the Laborers' CBA and Trust Agreement that permit the Funds to immediately address a delinquent fund dispute before a permanent arbitrator.[4]  (*See id*.; PLA at Art. 9).

In reply, the Funds posited that, while the Union, as a signatory to the PLA, was limited to the grievance procedure of the PLA, the Funds was not.  (*See* Arbitration Award at 3). Moreover, the Funds argued that it was a beneficiary under the Laborers' CBA of the "specific right to inform the [c]ontractor of the next higher contract level, provide notice of a delinquency claim of the Funds and inform the contractor to withhold from the subcontractor such disputed amount from the next advance until the dispute has been resolved."[5]  (*See id*. at 3).  Lastly, the Funds asserted that Pierson was the proper arbitrator under the controlling Laborers' CBA and Trust Agreement because the Laborers' CBA and the controlling Trust Agreement designate Pierson as the permanent alternate arbitrator for disputes arising out of the Laborers' CBA.  (*See id*.)

**3. The Arbitration Award**

In the Arbitration Award dated May 30, 2010, Pierson addressed Chanree's argument regarding the impact of the PLA on his ability to arbitrate the dispute.  The Arbitrator first

---

[4] Before Pierson, Chanree and Palmer also alleged that the Funds failed to provide due notice of the claim under the PLA.  (*See* Arbitration Award at 2 n.3, 3).  The Funds maintained that it had given Chanree notice of Palmer's delinquency as required by the CBA.  (*See id*. at 3).  Chanree does not renew the notice argument before this Court.

[5] Petitioners derive this authority from Article 15 of the Laborers' CBA, which provides that the Trustees "shall be entitled to all rights accorded by law . . . that may be necessary or desirable in their discretion to effectuate the payment and collection of any sum or sums and costs required to be paid to the [Funds,]" as well as attorneys' fees, court and arbitration costs, and interest on the amounts due.

evaluated two sections of the PLA, Article 11.2 and Article 9.  Article 11.2 provides in relevant part:

> A. The Contractors agree to pay contributions of behalf of all employees covered by this Agreement to the established employee benefit funds in the amounts designated in the appropriate Schedule A; .....
>
> B. The Contractor agrees to be bound by the written terms of the legally established Trust Agreements specifying the detailed basis on which payments are to be paid into, and benefits paid out of, such Trust Funds but only with regard to work done on this Project and only for those employees to whom this Agreement requires such benefit Payments.
>
> C. Should any contractor or sub-contractor become delinquent in the payment of contributions to the fringe benefit funds, then the subcontractor at the next higher tier, or upon notice of the delinquency claim from the Union or the Funds, agrees to withhold from the subcontractor such disputed from the next advance, or installment payment for work performed until the dispute has been resolved.

(*See id*. at 4).  As used in the PLA, "Schedule A" refers to the Laborers' CBA, which was attached to the PLA and was incorporated into the agreement.  (*See* PLA at Art. 2.4).  Article 9 of the PLA establishes that "[a]ny question of dispute out of and during the term of this Project Labor Agreement (other than trade jurisdictional disputes) shall be considered a grievance and subject to resolution" under a procedure that would require the disputing parties to mutually select an arbitrator or request that one be chosen by the American Arbitration Association."  (*See* Arbitration Award at 4.).  The Arbitrator also reviewed language from the Laborers' CBA that require general contractors to withhold funds due to its subcontractors when notified that the subcontractor has been deemed delinquent in its fund contributions.  (*See id*. at 4-5).

The Arbitrator found that while his ability to arbitrate did not originate in the PLA, Article 11.2 of the PLA recognizes that "individual 'Schedule A' (Local Union agreements) [are permitted] to establish the contribution levels of each signatory trade and [the PLA] defers to the individual Trust Agreements to establish how contributions are paid."  (*See id*. at 5).  The

6

Arbitrator further found that "[i]nherent in that deferral is recognition that an individual trust fund may also maintain established procedures for enforcement and collection of benefit fund delinquencies pursuant to 'the written terms of the legally established Trust Agreement.'" (*See id.*).  Moreover, the Arbitrator noted that his findings were supported by the Third Circuit Court of Appeals' decision in *N.J. Bldg. Laborers' Statewide Benefit Funds and the Trustees There of v. Am. Coring & Supply*, 341 F. App'x 816, 818 (3d Cir. 2009), where the Court recognized that, under the Trust Agreements, the Funds "'shall not be required to exhaust any grievance or arbitration procedure provided by a [CBA] ... but rather shall have immediate access to the courts ... or *to designate a permanent arbitrator to hear and determine collection disputes*.'" (*See* Arbitration Award at 5-6).[6]  Thus, Pierson determined that that he had jurisdiction to hear and determine the case before him through the Laborers' CBA and the Trust Agreement.  (*See id.* at 6).

The Arbitrator further found that pursuant to "Article 16.10 of the [Laborers' CBA], the Funds may exercise its rights under Article 16.20 and pursue assignment and transfer all rights, title, and interest in all monies due it from the *general contractor* . . . to [the] Funds in the amount up to the sum due to the Funds." (*See id.* at 9).  Thereafter, the Arbitrator found that Palmer, in work performed on behalf of Chanree on the Chesterfield Project, was delinquent in remitting benefit contributions for the months February, March and April of 2010.  In so deciding, however, the Arbitrator found that certain payments were made by Chanree which reduced the delinquency contribution amount sought by the Funds from $316,039.51 to a total of $220,887.58 (the "Award").  (*See id.* at 9).  The Arbitrator ordered Chanree to withhold payment

---

[6] The Third Circuit also recognized that "A May 2007 resolution amended the Trust Agreement to designate J.J. Pierson, Esq., as the Funds' 'alternate permanent arbitrator.'" *See Am. Coring*, 341 F. App'x at 818.

due to Palmer in that amount and make payment of the Award to the Funds as required by the Laborers' CBA.  (*See id*. at 10).

**5. The Present Case**

On August 17, 2010, following non-payment by Chanree, the Funds initiated this action to confirm the Arbitrator's award.  (*See* Pet'r's Pet. To Confirm).  On August 27, 2010, Chanree filed a cross-motion to vacate and/or modify the Arbitration Award, and a brief in support.[7]  (*See* Resp't's Cross-Motion; Resp't's Br.).  On September 13, 2010, the Funds filed a reply brief in further support of its motion to confirm the Arbitration Award, and in opposition to the cross-motion to vacate.  (*See* Pet'r's Reply. Br.).  For the reasons that follow, the Funds' petition to confirm the arbitration award is granted; Chanree's cross-motion to vacate is denied.

**II. STANDARD OF REVIEW**

When parties to a CBA agree to settle a dispute through arbitration, the Court's review of the resulting decision of the arbitrator is "extraordinarily limited."  *See Dauphin Precision Tool v. United Steelworkers of Am.*, 338 Fed. Appx. 219, 222 (3d Cir. 2009) (citing *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)).  "We do not review the merits of the decision or correct factual or legal errors." *Id.* (citing *Garvey*, 532 U.S. at 509; *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 279 (3d Cir. 2004)).  Rather, this Court "must enforce an arbitration award if it is based on an arguable interpretation of the collective bargaining agreement, and we may only vacate an award if it is entirely unsupported by the record or if it reflects a 'manifest disregard' of the agreement." *Id.* at 222-23 (quoting *Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1291 (3d Cir. 1996)

---

[7] Chanree's cross-motion requests that the Arbitration Award be vacated and/or *modified*, but its brief in support only argues for the award to be vacated.  (*See* Resp't's Cross-Motion; Resp't's Br.)

(quoting *News Am. Publ'ns, Inc. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir. 1990)). In other words, unless the "arbitrator's decision is wholly unsupported by the agreement's plain language or the arbitrator fails to adhere to basic principles of contract construction[,]" a court is not permitted to overturn that decision. *Cacace Associates, Inc. v. Southern New Jersey Bldg. Laborers Dist. Council*, No. 3:07-cv-5955-FLW, 2009 WL 424393, *3 (D.N.J. Feb. 19, 2009) (citing *News Am. Publ'ns, Inc., Daily Racing Form Div. v. Newark Typographical Union, Local 103*, 921 F.2d 40, 41 (3d Cir. 1990); *Exxon Shipping Co. v. Exxon Seamen's Union*, 801 F.Supp. 1379, 1384 (3d Cir. 1992)). This Court's obligation is to "uphold an arbitrator's judgment if the decision, on its face, was drawn from the parties' agreement or is remotely based on reasonable contractual interpretation." *Id.* (citing *United Trans. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995)).

However, when examining the arbitrability of an issue, a court should not give deference to the arbitrator's decision, and instead should "'independently review the agreement'" and "'exercise plenary review to determine whether the matter is arbitrable.'" *See Int'l Union of Bricklayers & Allied Craftworkers, Local 5 v. Banta Tile & Marble Co., Inc.*, 344 Fed. Appx. 770, 772 (3d Cir. 2009) (quoting *McKinstry Co. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 16*, 859 F.2d 1382, 1385 (9th Cir. 1988) (citation omitted)); *see also U.S. Small Business Admin. v. Chimicles*, 447 F.3d 207, 209 (3d Cir. 2006) (stating that whether a party has agreed to arbitrate is a legal question which requires plenary review). "[A] question of arbitrability is raised only where disputes concern 'whether the parties are bound by a given arbitration clause' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *N.J. Bldg. Laborers*, 341 Fed. Appx. at 820 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002)).

Additionally, "where one of the parties seeking arbitration is not a signatory to the underlying agreement, a further step is added to the inquiry. Before the presumption of arbitrability can apply, the non-signatory party must show that the signatories intended it to derive benefits from the agreement." *Int'l Union of Bricklayers*, 344 Fed. Appx. at 772 (quoting *McKinstry*, 859 F.2d at 1384).   When the non-signatory shows such intent, and "where the arbitration clause is susceptible to the interpretation that the non-signatory has the right to enforce these benefits, then arbitration is proper." *Id*. (quoting *McKinstry*, 859 F.2d at 1384-85).

## III. DISCUSSION

Petitioners seek confirmation of the Arbitration Award, as well as costs, attorney's fees, and interest thereupon.  Chanree argues that the Arbitration Award should be vacated because the Arbitrator lacked jurisdiction under the PLA.  In the alternative, Chanree argues that the award should be vacated because the Arbitrator calculated the delinquent amount in an amount that was improper under the PLA.  For the reasons that follow, the Court finds that Petitioners properly went before Pierson to arbitrate the parties' dispute.  In addition, the Court upholds the Arbitrator's ruling.

### A. The Arbitrator Had Jurisdiction under the Laborers' CBA and the Trust Agreement to Hear the Dispute

Because Chanree posits that the arbitration clause in the CBA does not apply in this case, thereby challenging the jurisdiction of the arbitrator, the Court exercises plenary review on this issue.[8]  Chanree contends that the arbitration process set forth in Article 9 of the PLA should have been followed because under the PLA's "supremacy clause," terms of the PLA supersede

---

[8]  Petitioners argue that the Arbitrator's decision regarding his ability to hear the matter pursuant to the Laborer's CBA should be afforded great deference.  This argument is specious because the Arbitrator's jurisdiction is a question of arbitrability for the Court to determine. *Am. Coring & Supply*, 341 Fed. Appx. at 820.

the effect of any language in the Laborers' CBA and the Trust Agreement that are inconsistent with the PLA. In that regard, Chanree argues that because the PLA specifically sets forth a dispute resolution process, Petitioners should have followed those procedures instead of those provided under the CBA and the Trust Agreement.  The Court disagrees with Chanree's interpretation of the PLA.

The "supremacy clause" of the PLA states in relevant part:

> This Agreement, together with the local [CBAs] appended hereto as Schedule A (CBA) represents the complete understanding of all signatories and supersedes any national agreement, local agreement or other collective bargaining agreement of any type which would otherwise apply to this Project, in whole or in part. Where a subject covered by the provisions, explicit or implicit, of this Agreement is also covered by a Schedule A, the provisions of this Agreement shall prevail.

PLA at Art. 2.4. Indeed, pursuant to the above language, the PLA incorporates, by express language, the Laborer's CBA; in that regard, the PLA supersedes the terms of that CBA when the two agreements contain express provisions that contradict each other.  In addition, Paragraph B of Article 11.2 of the PLA specifically provides that the "Contractor [Chanree] agrees to be bound by the written terms of the legally established Trust Agreements specifying the detailed basis on which payments are to be paid into, and benefits paid out of, such Trust Funds but only with regard to work done on this Project and only for those employees to whom this Agreement requires such benefit Payments."  PLA, Art. 11.2.

Article 9 of the PLA provides a three-step process for non-strike grievances.[9]  *See id.* at Art 9.  Importantly, pursuant to the language of the PLA, the grievance procedures only apply to the contractors, unions and employees of the project.

---

[9]  Although the PLA does designate a permanent arbitrator and does provide for expedited arbitration before a permanent arbitrator other than Pierson, such procedures apply only to strikes by labor or lockouts by a contractor.  *See* PLA, Art. 7.4.

### 9.1 PROCEDURE FOR RESOLUTION OF GREIVANCES

**9.1.1** This Agreement is intended to provide close cooperation between management and labor . . .

**9.1.2** *The Contractors, Unions, and the employees*, collectively and individually, realize the importance to all parties to maintain continuous and uninterrupted performance of the work of the Project, and agree to resolve disputes in accordance with the grievance-arbitration provisions set forth in this Article.

*See id* (emphasis added).  On the other hand, the CBA specifically affords the Fund Trustees, "such rights and duties as set forth in the Plans and in the Agreements and Declaration of Trusts and any supplements or amendments thereto" when it comes to the collection of fringe benefit delinquencies.  CBA, Art. 15.50(a).  The Trust Agreement explicitly permits the Trustees to

> take any action necessary or appropriate to enforce payment of the contributions, interest, damages, and expenses provided for herein, including, but not limited to, proceedings at law or in equity.  The Fund and Trustees shall not be required to exhaust any grievance or arbitration procedure provided by a Collective Bargaining Agreement or otherwise with respect to the enforcement of such Employer obligations, but rather shall have immediate access to the courts, as provided under applicable law, or to designate a permanent arbitrator to hear and determine collection disputes.

Declaration of Trust, pp. 19-20.

Following the plain language of the agreements, Chanree's position is untenable because Petitioners were not able to avail themselves of the PLA's dispute procedure under Article 9; those procedures were only dedicated to contractors, unions and employees related to the PLA. *See* PLA, Art. 9.1.2, 9.1.3.  Undisputedly, Petitioners are separate entities from the Union and the contractors of the PLA, and Petitioners are not signatories to the PLA. In addition, the PLA is silent regarding the dispute process for beneficiaries, such as Petitioners, and the PLA is silent with respect to the mechanism a fund would employ to collect delinquent contributions.[10]  As

---

[10]  In fact, Article 11.2C of the PLA only provides that "[s]hould any contractor or sub-contractor become delinquent in the payment of contributions to the fringe benefit funds, then the

such, there is no provision of the PLA that would contradict or supersede the relevant portions of the Laborers' CBA related to the dispute procedures expressly provided for the Fund. Furthermore, the PLA explicitly recognizes that the contractor, here Chanree, agreed to be bound by the terms of the Trust Agreement regarding benefit payments. *See id* at 11.2(B). Therefore, it was proper for the Arbitrator, Pierson, to arbitrate the proceeding according to the process set forth in the Laborers' CBA and the Trust Agreement.[11]

## B. THE ARBITRATOR CORRECTLY CALCULATED THE AWARD

Chanree also argues that the award should be vacated because Article 11.2(A) of the PLA limits obligations owed under the Laborers' CBA to "only such bona fide employee benefits as are explicitly required under N.J.S.A. 34:11-56.30," which establishes the prevailing wage rate for New Jersey public works projects. *See* Resp't's Br. at 7-9. Chanree contends that the Arbitrator impermissibly awarded the Funds delinquent fund contributions at a rate of $21.60 per hour, when the rate should have been $19.67 per hour, as that is the prevailing wage benefit in

---

subcontractor at the next higher tier, or upon notice of the delinquency claim from the Union or the Funds, agrees to withhold from the subcontractor such disputed amount from the next advance, or installment payment for work performed until the dispute has been resolved." PLA, Art. 11.2C.

[11] Chanree also argues that the arbitration was improper because, under Article 11.2(B) of the PLA, it only agreed "to be bound by the written terms of the legally established Trust Agreements *specifying the detailed basis on which payments are to be paid into*, *and benefits paid out of*, such Trust Funds." *See* Resp't's Br.at 9-10. Chanree contends that "[i]t is a fundamental principle of contract construction that a reference in a contract to another extraneous document for a limited or particular purpose makes the extraneous document a part of the contract only for that limited or particular purpose so specified." *See id*. at 10. Chanree's argument is unavailing because, as discussed *supra*, the PLA incorporates the Laborers' CBA, which explicitly recognizes the validity of the Trust Agreement, and the Trust Agreement provides the Funds with the power to pursue arbitration before Pierson.

Burlington County, the site of the Chesterfield Project, for May 1, 2009 through April 30, 2011.[12]  *See id.* at 9; *see also* Hocking Cert, Ex. F.  Chanree's argument is without merit.

The New Jersey Prevailing Wage Act (the "Act"), N.J.S.A. 34:11-56.25 to -56.46, requires "that every public-work contract in excess of $2000, to which any public body is a party, must provide that workmen employed to perform the contract be paid at least the prevailing wage rate." *See Dep't of Labor v. Titan Const. Co.*, 102 N.J. 1, 6 (1985); *see also Serraino v. Mar-D, Inc.,* 228 N.J. Super. 482, 485 (N.J. Super. Ct. Law Div. 1988) (explaining that employers are not permitted under the Act to pay employees less than the prevailing wage rate).  The Act defines "prevailing wage" as "the wage rate paid by virtue of collective bargaining agreements by employers employing a majority of workmen of that craft or trade subject to said collective bargaining agreements, in the locality in which the public work is done[,]" and is set for a two-year period. *See id.* at 6-7 (citing *N.J.S.A.* 34:11-56.26(9)).   The Commissioner of Labor is empowered to establish the prevailing wage rate on the basis of the collective bargaining agreements covering the majority of workers for a particular craft or trade in that locality, *N.J.S.A.* 34:11-56.30, but nothing in the Act "shall prohibit the payment of more than the prevailing wage rate . . ." *N.J.S.A.* 34:11-56.28.

Chanree has not demonstrated that the rate used by the Arbitrator to calculate the delinquent fund contributions was not reasonably related to the underlying agreements.  The PLA recognizes that "employees . . . shall be . . . paid the base hourly wage rates . . . as specified in the attached Schedule[] A.[,]" and that "[t]he Contractors agree to pay contributions on behalf of all employees covered by this Agreement to the established employee benefit funds in the

_____

[12] In its cross-motion, Chanree asserts that the Funds were awarded delinquent contributions at a rate of $21.67 per hour, unlike in its brief, where Chanree claims the rate to have been calculated at $21.60 per hour. *See* Resp't's Cross-Motion.  This difference is irrelevant for the purposes of this Motion.

amounts designated in the appropriate Schedule A[.]"   *See* PLA at Art 11.1 -11.2(a).   The 'Schedule A' Laborers' CBA establishes that the prevailing wage for laborers in Burlington County is the combined wage and benefit rate.   *See* CBA at Art. 10.   It is undisputed that the applicable hourly fringe benefit rate was $19.67.   *See* Hocking Cert., Ex. F.   Furthermore, Article 14 of the Laborers' CBA also entitles the Funds to certain withheld check-offs from the wages of the subcontractor's employees, which the Funds contends makes up the approximately $1.93 per hour difference.   *See* Pet'r's Reply. Br. at 23-24.   The Arbitrator heard testimony regarding the delinquent contributions, and in connection with an examination of the underlying agreements, came to the conclusion that the rate included not only the prevailing wage rate, but also the check-offs owed to the Funds under the Laborers' CBA. Furthermore, Chanree has presented no evidence to rebut the PLA's plain language, which requires employers to not only pay the base hourly rate as found in the Laborers' CBA, but also pay contributions to the Funds on behalf of its employees as described in the Laborers' CBA.   Therefore, because the Funds were entitled to hourly rates as well as fund contributions under both the PLA and the Laborers' CBA, it was not improper for the arbitration award to reflect both of those rates.

**C. Attorney's Fees are Warranted**

In addition to an order confirming the arbitration award, Petitioners seek reasonable attorney's fees and costs.   Petitioners are entitled to these fees as both a matter of law and contract.   Section 502(g) of ERISA, 29 U.S.C. § 1132(g)(2), authorized awards of attorney fees and costs in any action "in which a fiduciary seeks delinquent fund contributions."   *See Sheet Metal Workers Local 19 v. Keystone Heating and Air Conditioning*, 934 F.2d 35, 39 (3d Cir. 1991); *Local 478 Trucking and Allied Industries Pension Fund v. Jayne*, 778 F.Supp 1289, 1328 (D.N.J. 1991) (citations omitted) (explaining that under § 1132(g)(2), an "[a]ward of …

reasonable attorney's fees is mandatory, not discretionary.").   Additionally, Petitioners are explicitly entitled to reasonable attorney's fees and costs pursuant to Article 15.30(d) of the Laborers' CBA, as well as Article 5, Section 4 of the Trust Agreement.  (*See* CBA at 15.30(d); Monica Cert., Ex. C at Art. 4, Sec. 5).  Chanree does not contest that it has not complied with the Arbitration Award.  Thus, Petitioners are entitled to attorney fees.  Pursuant to L. Civ. R. 54.2, no later than 30 days from the date of the Order accompanying this Opinion, Petitioners shall submit their fee application.

## IV. CONCLUSION

Based on the foregoing, Petitioners' petition to confirm the arbitration award in the amount of $220,887.58 is granted, as well as Petitioner's request for attorney's fees.  Both judgments are to be entered only against Chanree.  Consequently, Respondents' cross-motion to vacate arbitration award is denied.

An order will be entered consistent with this Opinion.

_____ s / Freda L. Wolfson_____
FREDA L. WOLFSON, U.S.D.J

Dated: March 28, 2010

16